### In re SWEETWATER, et al., Debtors.

### Bankruptcy No. 83A–02582.

United States Bankruptcy Court,
D. Utah, C.D.

June 1, 1984.

---

8. *Id.*

Thomas G. Rohback, LeBoeuf, Lamb, Leiby & MacRae, Salt Lake City, Utah, for debtor.

Herschel J. Saperstein and Vernon L. Hopkinson, Watkiss & Campbell, Salt Lake City, Utah, for First Security Financial.

## MEMORANDUM OPINION

JOHN H. ALLEN, Bankruptcy Judge.

This case raises the question of whether a lessor is entitled to adequate protection prior to the debtor's assumption or rejection of an unexpired lease. This Court holds that a lessor is not entitled to adequate protection.

### FACTUAL AND PROCEDURAL BACKGROUND

The debtor, Sweetwater, is primarily engaged in the business of condominium timesharing. Sweetwater and its subsidiaries own, develop, and manage timeshare properties in resort locations including Bear Lake, St. George, Lake Powell and Park City, Utah; Jackson Hole, Wyoming; San Diego, Palm Springs and San Francisco, California; Lake Conroe, Galveston and South Padre Island, Texas; Waikiki and Kauai, Hawaii; and Acapulco, Puerto Vallarta, Cancun and Mazatlan, Mexico. The timeshare plans sold by the debtor consist primarily of fee ownership programs, except for the Mexico properties which are sold as right-to-use programs.

Sweetwater filed a petition under Chapter 11 of the Bankruptcy Code on September 23, 1983. Thereafter, First Security Financial (First Security), filed motions requesting the Court (1) to set a date by which the debtor must assume or reject certain leases with First Security; (2) to compel the debtor to adequately protect First Security's interest in the leased property for the period between the filing of the petition and the date of the debtor's assumption or rejection of the leases; and (3) to grant relief from the automatic stay in the event adequate protection is not provided.

First Security's motions concern various leases between itself as assignee of the interest of MFT Leasing Company, and the debtor, as lessee. The personal property which is the subject of the leases consists of snowmobiles, a computer, office furniture, lawn mowers, boat motors, stereo equipment and other property which will rapidly depreciate in value. Since the filing of its petition, the debtor has continued to retain possession of and use the leased property, but has made no payments under the terms of the leases. The parties filed a stipulation with the Court in which they agreed on the rate of depreciation per month and the fair rental value of the leased property.

A hearing was held to consider First Security's motions. By stipulation of the parties, the only issue presented to the Court was whether First Security, as a lessor, is entitled to adequate protection of its interest in the leased property during the period between the filing of the petition and the date of the debtor's assumption or rejection of the leases. At the conclusion of the hearing the matter was taken under advisement. The Court now renders the following opinion.

### ADEQUATE PROTECTION AND THE LESSOR'S INTEREST

The concept of adequate protection is found in Section 361 of the Bankruptcy Code, which provides:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

The phrase "adequate protection" does not delineate a term of precise meaning and is not defined in any section of the Code. *In re Alyucan Interstate Corp.*, 12 B.R. 803, 805, 7 B.C.D. 1123, 1124 (Bkrtcy. D.Utah 1981); *In re Rogers Development Corp.*, 2 B.R. 679, 683, 5 B.C.D. 1392, 1394 (Bkrtcy.Va.1980).[1] Rather, Section 361 provides three non-exclusive methods of providing adequate protection. The methods are illustrative and not intended to be exhaustive.

The Bankruptcy Code is not merely a connected group of words, phrases and sentences, existing in a vacuum. It is the culmination of eight years' work by a Congressional Commission, two Congressional committees and numerous outside groups. 124 Cong.Rec. H11089 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards). It must be considered in the context of its background and environment. For this reason, in order to ascertain its meaning, it is necessary to consider its legislative history.[2]

The Bankruptcy Code evolved from the study and recommendations of the Commission on Bankruptcy Laws of the United States. The Commission was created in

---

1. In *In re Alyucan Interstate Corp., supra,* 12 B.R. at 803 (Bkrtcy.D.Utah 1981), this Court analyzed adequate protection in the context of providing an "equity cushion," and in *In re South Village, Inc.,* 25 B.R. 987, B.C.D. 1332 (Bkrtcy.D.Utah 1982), considered the question of whether a secured creditor was entitled to

receive the use value of its money as an element of adequate protection.

2. This Court has always relied heavily on legislative history in interpreting the Bankruptcy Code. *Cf.* 2A C. Sands, Sutherland on Statutory Construction §§ 48.01, *et seq.* (4th ed. 1973).

1970 by Public Law 91–354. Its nine members included bankruptcy practitioners, scholars, district court judges, two Congressmen and two Senators. On July 30, 1973, the Commission filed its report.[3]

Part II of the Commission's Report consisted of a proposed statute, "The Bankruptcy Act of 1973," and accompanying explanatory notes. Section 7–203 of this proposed statute would have provided adequate protection for lessors. That section states:

### Use of Property Leased or Subject to a Lien.

(a) Use of Property. Notwithstanding the terms of a lease of personal property or a security agreement,

(1) the trustee, receiver, or the debtor when no trustee or receiver is appointed, may use property of the estate subject to a lien, and the proceeds thereof, and personal property leased pursuant to a lease that has not been assumed, in the operation of the business of the debtor, until termination of the stay prescribed by section 4–501; and

(2) property acquired by the trustee or the debtor after the date of the petition shall not be subject to any lien resulting from a security agreement entered into by the debtor prior to the date of the petition.

(b) Relief from or Modification of Stay. Pursuant to the Rules of Bankruptcy Procedure and section 4–501(c), a secured party or lessor may file a complaint (1) to terminate the stay, or (2) to modify the stay by imposing such conditions on the use of the property or the proceeds thereof as will adequately protect the secured party. The trustee or debtor shall have the burden of proving that the value of the secured creditor's interest in the property or the property leased as of the date of the petition is adequately protected.[4]

The Commission's proposed legislation was introduced in the 93rd Congress[5] but no action was taken. It was reintroduced in the 94th Congress.[6] The National Conference of Bankruptcy Judges, which opposed a number of the provisions in the Commission's proposed act, drafted its own version. The Judges' bill was likewise introduced in the 93rd Congress[7] and reintroduced in the 94th Congress.[8]

Section 4–715 of the Judges' bill was similar to Section 7–203 of the Commission proposal and provided for adequate protection to lessors. It states:

### Use of Property Leased or Subject to a Lien.

(a) Use of Property.—Notwithstanding the terms of a lease of property or a security agreement, the trustee, or the debtor when no trustee is appointed, may, until termination of the stay prescribed by section 4–501, use—

(1) rents and profits of real estate owned or held under lease by the debtor;

(2) property leased pursuant to a lease that has not been assumed; and

(3) property of the estate subject to a lien, other than the proceeds of collateral, and may continue to use the proceeds of collateral upon the filing of an involuntary petition or upon the filing of a voluntary petition, if notice of the filing of the petition is served upon the secured party or parties by any form of mail requiring a signed receipt concurrently with the filing of the petition.

(b) After-Acquired Property.—Property acquired by the trustee or the debtor

**3.** Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93d Cong., 1st Sess. pts. I and II (1973).

**4.** *Id.,* Pt. II at 236.

**5.** H.R. 10792, 93d Cong., 1st Sess. (1973); S. 2565, 93 Cong., 1st Sess. (1973).

**6.** H.R. 31, 94th Cong., 1st Sess. (1975); S. 236, 94th Cong., 1st Sess. (1975).

**7.** H.R. 16643, 93d Cong., 2d Sess. (1974); S. 4060, 93d Cong., 2d Sess. (1974).

**8.** H.R. 32, 94th Cong., 1st Sess. (1975); S. 235, 94th Cong., 1st Sess. (1975).

after the date of the petition shall not be subject to any lien resulting from a security agreement entered into by the debtor prior to the date of the petition.

(c) Relief from or Modification of Stay. —Pursuant to the Rules of Bankruptcy Procedure and section 4–501(c), a secured party or lessor may file a complaint (1) to terminate the stay, or (2) to modify the stay by imposing such conditions on the use of the property or the proceeds thereof as will adequately protect the secured party. The trustee or debtor shall have the burden of proving that the secured creditor's interest in the property or the property leased as of the date of the petition is adequately protected.

During 1975 and 1976, the Commission's bill and the Judges' bill were the subject of extensive hearings before subcommittees of the House and Senate Judiciary Committees.[9] In those hearings, several witnesses expressed views respecting protection of the lessor's interest during reorganization proceedings. In a statement submitted to the House Subcommittee on Civil and Constitutional Rights, the American Association of Equipment Lessors made known the concerns of its members, as follows:

[S]ection 4–602 of the bills should not deprive the lessor of his contractual right to terminate the lease or to prohibit its assignment in connection with a reorganization proceeding. At the very least, the bills should not allow the trustee in

bankruptcy to assume or assign the lease unless all prior defaults are cured and the lessor receives adequate assurance that the trustee or assignee is able and willing to fulfill the requirements of the lease. In addition, in the event that the trustee in a reorganization proceeding may use the leased property in the operation of the "debtor's" business pursuant to Section 7–203 of H.R. 31, the bill should specifically provide that the trustee must pay all rentals relating to such use, perform required maintenance and repairs, and honor the other obligations of the lease. For otherwise, the lessor's property could in effect be taken from him without fair compensation for its use and its residual value could be dissipated during the period of use by the trustee.

*Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 2d Sess., Ser. No. 27, pt. 3 at 1866 (1976).*

In a prepared statement, Patrick Murphy, a leading authority on creditors' rights in bankruptcy, observed that "[t]he starting point in this area should be acceptance of the concept that the secured creditor has a constitutionally guaranteed right to have the value of its collateral guaranteed throughout the proceeding." *Hearings on H.R. 31 and H.R. 32, supra,* pt. 1 at 439 (1975).[10]

9. *Hearings on H.R. 31 and H.R. 32 before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary, 94th Cong., 1st & 2d Sess. (1975–76); Hearings on S. 235 and S. 236 before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary, 94th Cong., 1st Sess. (1975).*

10. Eli Silberfield, general counsel for the National Commercial Finance Conference, observed in his testimony that "[t]he fundamental conflict in all of this area is the struggle between secured creditors and the debtor or unsecured creditors because they usually side with the debtor on this question, as to how long he is going to be given to try to rehabilitate, reorganize and how quickly are you going to allow the secured creditor to realize on its collateral.

"It is a continuous struggle. It requires a very delicate balancing of interests and the public is

involved as well because the public wants to see a business unit continue, if possible, and not be liquidated.

"I don't think any statute is going to answer that question. I think that is a question that is going to exist forever because it is something you are going to have to deal with under our system.

"There is nothing in this statute that tells the court how to decide that issue. That issue is going to come up under this statute, no matter how many times it is modified or changed.

"All you can do is perhaps suggest some guidelines and some standards. I am inclined to think that they ought not be too detailed. The secured creditors would like to see as much detail as possible in the statute."
*Hearings on H.R. 31 and H.R. 32, supra* note 9, pt. 3 at 1834–35 (1976).

In the explanatory note accompanying Section 7–203 of the Commission bill, the drafters state that the provision is essentially a codification of case law on the subject.[11] The cases cited were *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir.1967), and *In re Bermec*, 445 F.2d 367 (2d Cir.1971). In *Yale Express*, a secured creditor, Fruehauf Corporation, claimed that it was entitled to reclaim property held by the trustee in a Chapter X reorganization. Fruehauf held a perfected security interest, in the form of chattel mortgages, in fifty trailers and sixty-two truck bodies. The terms of the chattel mortgages required monthly installment payments to be made for five years. The debtor made two payments and then filed its petition for reorganization under Chapter X. After the debtor failed to make five of the required payments, Fruehauf made a formal demand upon the trustee. The trustee refused to release the collateral valued at $380,-000, on which less than $15,000 had been paid. Fruehauf then filed a Petition for Reclamation in the bankruptcy proceeding.

The district court found "cogent equitable reasons" for not permitting reclamation of the collateral, without explaining its rationale, and denied the requested relief. On appeal to the Second Circuit, the case was remanded for a determination of whether equitable considerations warranted the making of use payments to the secured creditor. The court stated that "[c]onsideration should be given by the district judge, for example, to the propriety of requiring Yale to make rental payments for the use of the trucks and trailers during the period of reorganization." 370 F.2d at 439.

Following remand, the case was again appealed to the Second Circuit. *In re Yale Express System, Inc.*, 384 F.2d 990 (2d

Cir.1967). In *Yale Express II*, the Court of Appeals upheld the district judge's denial of Fruehauf's Application for Reclamation or rental payments. The court found that reclamation would frustrate the debtor's prospects of reorganization and that, if rental payments were allowed other secured creditors would require the same, thereby jeopardizing "the reorganization as effectively as granting the petition for reclamation." 384 F.2d at 992. Of crucial importance to the Second Circuit was the district court's finding that a successful reorganization of the debtor was a reasonable possibility. It is also noted that "to such extent as Fruehauf has been damaged by the use of its property pending the reorganization, it is entitled to equitable consideration in the reorganization plan." *Id.*

The debtor in *In re Bermec, supra,* was in the business of leasing trucks and tractor-trailers in the United States and Canada. It had sustained substantial operating losses for four years, was unable to meet its current obligations, and was insolvent. After filing its Chapter X petition, secured creditors opposed the petition on the ground that it was not filed in good faith, arguing that it was unreasonable to expect that a plan of reorganization could be effected. The Special Master filed a report in which he reviewed the evidence and found that it was not unreasonable to expect that a plan of reorganization could be effected and that the petition was filed in good faith. The secured creditors appealed from the district court's order approving the Chapter X petition.

In a *per curiam* opinion affirming the lower court, the Second Circuit stated:

> We are conscious of the deep concern of the manufacturing secured creditors

---

**11.** Report of the Commission on the Bankruptcy Laws of the United States, *supra* note 2, pt. II at 236 (1973). Commentators and witnesses disagreed, and observed that the provision represented a radical departure from existing law. *See e.g.,* Coogan, Broude & Glatt, "Comments on Some Reorganization Provisions of the Pending Bankruptcy Bills," 30 Bus.Law. 1149, 1167–68 (1975); *Hearings on H.R. 31 and H.R. 32, supra*

note 9, pt. 3 at 1813 (1976) (Comments submitted by National Commercial Finance Conference, Inc., on Section 7–203 of H.R. 31 and Section 4–715 of H.R. 32). *See also* Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483 (1975).

lest their security depreciate beyond adequate salvage, but we must balance that with the Congressional mandate to encourage attempts at corporate reorganization where there is a reasonable possibility of success. Nor can we find clearly erroneous the finding that the Trustees will be able to pay the "economic depreciation" on the secured creditors' equipment so as approximately to preserve their status quo. In sum, we cannot find the prospect so hopeless as to require setting aside the order below as might have been required in a case where there was, indeed, no reasonable possibility of a successful reorganization.

445 F.2d at 369. Thus, without reference to the *Yale Express* cases, the Second Circuit again balanced the rights of secured creditors who demanded lien enforcement against the possibility of successfully reorganizing the debtor, but included payments to secured creditors for the depreciation of their equipment so as "approximately to preserve their *status quo.*" Both *Yale Express* and *Bermec* were expressions of judicial concern for the rights of secured creditors.

On January 6, Congressmen Edwards and Butler introduced a new Bill, H.R. 6, drafted by Richard Levin and Kenneth Klee of the staff of the Subcommittee on Civil and Constitutional Rights of the Judicial Committee of the House of Representatives.[12] The bill sought to incorporate the best features of the Commission bill and the Judges' bill, together with changes recommended by the National Bankruptcy Conference.

As the result of numerous mark-up sessions by the Subcommittee on Civil and Constitutional Rights, a clean bill was introduced on May 23, 1977, as H.R. 7330.[13] Subsequently, H.R. 7330 was improved as a result of further mark-up sessions and a new clean bill, superseding H.R. 7330, was introduced on July 11, 1977, for consideration by the full House Judiciary Committee. That bill was H.R. 8200,[14] the House version of what would become the Bankruptcy Reform Act of 1978. On October 31, 1977, Senator DeConcini introduced S. 2266,[15] the Senate counterpart of H.R. 8200. The House of Representatives passed H.R. 8200 by voice vote on February 1, 1978. 124 Cong.Rec. H478 (daily ed. Feb. 1, 1978). The Senate passed S. 2266 on September 22, 1978. 124 Cong.Rec. S15878 (daily ed. Sept. 2, 1978).

It is particularly illuminating to consider the transformation of the adequate protection concept from its first appearance in Section 7–203 of the Commission bill and Section 4–715 of the Judges' bill, to the versions in H.R. 8200 and S. 2266. In the early versions, the concept of adequate protection was intended to apply to property leased or subject to a lien. Lessors were treated in the same manner as secured creditors. Commission bill § 7–203; Judges' bill § 4–715. Both H.R. 8200 and S. 2266, however, contained a more complex system for classifying the rights of creditors in bankruptcy cases. A separate provision was included providing for the assumption or rejection of executory contracts and unexpired leases. *Compare* H.R. 8200, 95th Cong., 1st Sess. § 365 (1977) *with* S. 2266, 95th Cong.2d Sess. § 365 (1978).[16]

---

12. H.R. 6, 95th Cong., 1st Sess. (1977).

13. H.R. 7330, 95th Cong., 1st Sess. (1977).

14. H.R. 8200, 95th Cong., 1st Sess. (1977).

15. S. 2266, 95th Cong., 1st Sess. (1977).

16. Congress did not adopt suggested amendments to Section 365 that would have prohibited the debtor's use of leased property prior to assumption of the lease. Legal counsel for the Car and Truck Renting and Leasing Association, in a letter to Senator DeConcini, urged amendment of Section 365 of S. 2266 as follows:

> We believe the language of the bill should be amended or the legislative history expanded to make it clear that under agreements such as full-service vehicle lease agreements, the trustee retains the power to accept or reject the contract notwithstanding any bankruptcy clause or ipso facto clause, but that the trustee is not entitled to operate the equipment or demand additional operating supplies or services under such agreement unless and until he shall have either accepted the lease

Reference to the House Report accompanying H.R. 8200 and the Senate Report accompanying S.2266, and the statements of the floor managers, make it clear that Congress intended to treat secured creditors in a different manner than lessors. The House Report states:

The concept [of adequate protection] is derived from the fifth amendment protection of property interests. *See Wright v. Union Central Life Ins. Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). It is not intended to be confined strictly to the constitutional protection required, however. The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), 1978 U.S.Code Cong. & Admin. News, pp. 5787, 6295. *See also* S.Rep. No. 95–989, 95th Cong., 2d Sess. 49 (1978), 1978 U.S.Code Cong. & Admin.News, p. 5835.

The House Report indicates that the adequate protection concept is rooted in two Supreme Court decisions involving the constitutionality of two versions of the Frazier-Lemke Act. The Frazier-Lemke Act[17]

was a temporary emergency farmer relief act, passed by Congress during the Depression at a time when farm mortgage foreclosures were occurring at an alarming rate. That Act added subsection (s) to Section 75 of the Bankruptcy Act. The Frazier-Lemke Act applied only to pre-existing mortgage interests. In its original version, subsection (s) provided that if a farmer debtor failed to obtain the consents requisite to a composition under Section 75, he might petition to be adjudged a bankrupt. Paragraph (7) of subsection (s) stayed all proceedings against the debtor's property for five years, during which time the farmer had the right to remain in possession provided he paid a reasonable annual rental as determined by the court. The rental was to be distributed to secured and unsecured creditors in accordance with their interests. In addition, paragraph (7) provided that, at any time during the five-year period, the debtor could acquire full title to the property, with the mortgagee losing all rights under the mortgage, by paying into court the appraised value of the farm.

The constitutionality of the Frazier-Lemke Act was tested in the United States Supreme Court in three cases: *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935); *Wright v. Vinton Branch of the Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937); and *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1941).

In *Louisville Joint Stock Land Bank v. Radford, supra*, the Court, in a unanimous opinion by Justice Brandeis, held that the Frazier-Lemke Act violated the fifth amendment because it deprived the bank of substantive rights in specific property with-

---

on account of such operation or furnishing of additional supplies and services. In other words, although the benefits of an executory contract are made available to the trustee, he cannot demand performance by the other party until he himself undertakes to perform the assumed obligations or furnishes assurance to the other party against further loss and expense.

*Hearings on S. 2266 and H.R. 8200 before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary*, 95th Cong., 1st Sess. 882, 883 (1977).

17. Pub.L. No. 73–486, 48 Stat. 1289 (1934) (expired 1949).

out just compensation.[18] The court observed that "the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none...." 295 U.S. at 588, 55 S.Ct. at 863.

In response to the *Radford* decision Congress amended the Frazier-Lemke Act.[19] In *Wright v. Vinton Branch of the Mountain Trust Bank, supra,* the Supreme Court upheld the amended Act in another unanimous opinion by Justice Brandeis. The Court found that the amended Act adequately preserved three of the five rights enumerated in *Radford* and gave the bankruptcy courts sufficient discretion to protect the other two.[20]

The provisions of the amended Frazier-Lemke Act governing reappraisal and redemption were upheld in *Wright v. Union Central Life Insurance Co., supra.* The Court, in an opinion by Justice Douglas, commented upon the purpose of the Act and the rights of secured creditors:

> This Act provided a procedure to effectuate a broad program of rehabilitation of distressed farmers faced with the disaster of forced sales and an oppressive burden of debt. Safeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property. There is no constitutional claim of the creditor to more than that. And so long as that right is protected the creditor certainly is in no position to insist that doubts or ambiguities in the Act be resolved in its favor and against the debtor. Rather, the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act.

311 U.S. at 279–80, 61 S.Ct. at 200 (citations omitted).

Significantly, in *Kuehner v. Irving Trust Co.,* 299 U.S. 445, 57 S.Ct. 298, 81 L.Ed. 391 (1937), the Supreme Court recognized that the contract rights of a landlord under a lease may be constitutionally altered by Congress in the exercise of its bankruptcy powers. In upholding a provision of Section 77B of the Bankruptcy Act, which limited creditors' enforcement remedies under leases, the Court made the following distinction between the rights of secured creditors and those of lessors:

> As pointed out in [*Radford*] there is, as respects the exertion of the bankruptcy power, a significant difference between a property interest and a contract, since the Constitution does not forbid impairment of the obligation of the latter. The equitable distribution of the bankrupt's assets, or the equitable adjustment of creditors' claims in respect of those assets, by way of reorganization, may therefore be regulated by a bankruptcy law which impairs the obligation of the debtor's contracts. Indeed every bankruptcy act avowedly works such impairment. While, therefore, the Fifth Amendment forbids the destruction of a contract it does not prohibit bankruptcy legislation affecting the creditor's remedy for its enforcement against the debtor's assets, or the measure of the creditor's participation therein, if the statutory provisions are consonant with a fair,

---

**18.** The Court identified five property rights that were impaired by the Act:
 1. The right to retain the lien until the indebtedness thereby secured is paid.
 2. The right to realize upon the security by a judicial public sale.
 3. The right to determine when such sale shall be held, subject only to the discretion of the court.
 4. The right to protect its interest in the property by bidding at such sale whenever held.
 5. The right to control the property during the period of default, subject only to the discretion of the court, and to have the rents and profits collected by a receiver for the satisfaction of the debt.

**19.** 18 Pub.L. No. 74–384, 49 Stat. 942 (1935).

**20.** *See* note 18, *supra.*

reasonable, and equitable distribution of those assets.

299 U.S. at 451–52, 57 S.Ct. at 301. The distinction between the interests and rights of secured creditors, on the one hand, and those of lessors on the other, has been preserved in the Bankruptcy Code. *See* Ayer, "On the Vacuity of the Sale/Lease Distinction," 68 Iowa L.Rev. 667, 685–89 (1983). Taken together, the Frazier-Lemke Act cases relied upon by Congress in fashioning the adequate protection concept illustrate a concern for the rights of secured creditors.[21] It would be straining the language and logic of those cases to find an intention to protect the interest of lessors.

The most persuasive indication of congressional intent is the statement of the floor managers, Representative Edwards and Senator DeConcini.[22] In their joint explanatory statement, the floor managers declared that *"[a]dequate protection of an interest of an entity in property is intended to protect a creditor's allowed secured claim."* (Emphasis added). 124 Cong.Rec. H11092 (daily ed. Sept. 28, 1978) (remarks of Representative Edwards); 124 Cong.Rec. H17409 (daily ed. Oct. 6, 1978) (remarks of Senator DeConcini). It should also be noted, as this Court has previously pointed out, that nowhere in the legislative history have lessors been mentioned as being entitled to adequate protection. *In re Alyucan Interstate Corp., supra,* 12 B.R. at 806 n. 5.

Thus, the policies underlying Chapter 11 and the legislative history of Section 361 lend no support to the view that lessors are entitled to adequate protection. However, considering the language of Section 363(e), the Court is met by the argument that a lessor is entitled to adequate protection of

its property while the same is being used by the debtor in possession. It is to this issue that the Court now turns.

## SECTION 365 CONTAINS THE LESSOR'S EXCLUSIVE REMEDY

### The Relation of Sections 361, 363(e) and 365(b)(1)

■ Considered by itself, the language of Section 363(e) would at first appear to support the construction of the Bankruptcy Code urged by First Security. Under Section 363(e), an entity having an "interest in property," which the debtor proposes to use, is entitled to adequate protection of its interest. *See In re Alpa Corp.,* 11 B.R. 281, 289, 7 B.C.D. 791 (Bkrtcy.D.Utah 1981). Section 363(e) provides:

Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection.

■ Section 363(e) was intended to protect the collateral of secured creditors while the debtor in possession or trustee operated the business. *In re Curlew Valley Associates,* 14 B.R. 506, 514 n. 13, 8 B.C.D. 495 (Bkrtcy.D.Utah 1981). A construction of Section 363(e) that equates the lessor's interest with "an interest in property" entitled to adequate protection, would be "plainly at variance with the policy of the legislation as a whole." *See Ozawa v. United States,* 260 U.S. 178, 194,

---

**21.** *Cf.,* Rogers, "The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause," 96 Harv.L.Rev. 973–1031 (1983).

**22.** The joint explanatory statement of Representative Edwards, the floor manager of the bill in the House of Representatives, and Senator DeConcini, the floor manager in the Senate, is generally the most reliable and authoritative

indication of congressional intent regarding the meaning and effect of provisions of the Code. *In re Carey,* 8 B.R. 1000, 1004, 7 B.C.D. 310 (Bkrtcy.S.D.Cal.1981); Klee, "Legislative History of the Bankruptcy Reform Act of 1978," 1979 Ann.Surv.Bankr.L. 21, 33. *See Wright v. Vinton Branch of the Mountain Trust Bank, supra,* 300 U.S. at 463–64, 57 S.Ct. at 562; *In re Grand Jury Investigation of Cuisinarts, Inc.,* 665 F.2d 24, 34 (2d Cir.1981).

43 S.Ct. 65, 67 L.Ed. 199 (1922). *See also Church of Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892) ("[f]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.").

The prevailing view in the bankruptcy courts and among commentators is that lessors are entitled to adequate protection under Section 363(e) pending a decision to assume or reject the lease. *See, e.g., In re Attorneys Office Management, Inc.,* 29 B.R. 96, 10 B.C.D. 1427 (Bkrtcy.C.D.Cal. 1983); *In re Richards Pontiac,* 6 B.R. 773, Bankr.L.Rep. ¶ 67,775 (Bkrtcy.E.D.N.Y. 1980); *In re A.L.S., Inc.,* 3 B.R. 107, 6 B.C.D. 4, Bankr.L.Rep. ¶ 67,375 (Bkrtcy.E.D.Pa.1980); *Matter of Troy Industrial Catering Service,* 2 B.R. 521, 5 B.C.D. 1243, 1 C.B.C.2d 321 (Bkrtcy.E.D.Mich.1980); Fogel, "Executory Contracts and Unexpired Leases in the Bankruptcy Code," 64 Minn. L.Rev. 341 (1980); Jones, "The Automatic Stay and the Creditor Who has Leased Consumer Goods," 88 Comm.L.J. 134 (1983). *Cf. In re Inn at Longshore, Inc.,* 32 B.R. 942, 10 B.C.D. 1358 (Bkrtcy.D. Conn.1983) (attempt at reconciling sections 362, 363 and 365). However, none of the cited authorities considered the legislative history or the structure of the Code as a whole in making the determination.

Section 365(b)(1) provides that the debtor in possession or trustee may not assume an executory contract or unexpired lease which is in default unless the trustee:

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

Under Section 365, if the debtor in possession rejects the lease, it must return the property to the lessor. The lessor may assert an unsecured claim for the unpaid balance or may seek an allowance of administrative rent. If the debtor in possession chooses to assume the lease, it must satisfy all of the enumerated preconditions to assumption.[23]

The structure of the Bankruptcy Code indicates a congressional effort to balance competing interests and provide different treatment for different rights and interests. *See* Julis, "Classifying Rights and Interests Under the Bankruptcy Code," 55 Am.Bankr.L.J. 223–269 (1981). Granting adequate protection to a lessor during the interim between filing of the petition and the decision to assume or reject a lease is contrary to the Code's classification scheme and would render Section 365(b) meaningless.

 Under the Code's classification scheme, utility companies are entitled to "adequate assurance of payment" for postpetition services. 11 U.S.C. § 366(b). *See In re Santa Clara Circuits West, Inc.,* 27

---

**23.** *See* White, "The Recent Erosion of the Secured Creditor's Rights Through Cases, Rules and Statutory Changes in Bankruptcy Law," 53 Miss.L.J. 389, 419–20 (1983) ("If the trustee or the debtor instead chooses to assume the lease, he has the responsibility of curing any existing default, and then must comply with the lease, term by term. The full amount of the payments provided for in the lease must be made, and they must be made under the same schedule as provided in the lease. To repeat, the court has no option such as exists under section 1129 to conclude that the leased goods have a value less than that represented by the payments provided under the lease, and thus, to authorize lower payments or the same payments over a longer term."). The concept of "adequate assurance of future performance" is discussed in Simpson, "Leases and the Bankruptcy Code: The Protean Concept of Adequate Assurance of Future Performance," 56 Am.Bankr.L.J. 233 (1982), and Simpson, "Leases and the Bankruptcy Code: Tempering the Rigors of Strict Performance," 38 Bus.Law. 61, 72–78 (1982).

B.R. 680, 10 B.C.D. 365, 8 C.B.C.2d 85 (Bkrtcy.D.Utah 1982) (maximum cash deposit necessary to provide adequate assurance of payment is amount sufficient to cover average billing period plus amount sufficient to cover services between the end of the billing period and the due date of payment for that period). A debtor's trade creditors are shielded from preference liability for certain "ordinary course of business" transactions. 11 U.S.C. § 547(c)(2). *See* Levin, "An Introduction to the Trustee's Avoiding Powers," 53 Am. Bankr.L.J. 173, 186–87 (1979). A debtor's attorney may receive an interim award of fees as an administrative expense ahead of a superpriority, *In re Callister*, 15 B.R. 521, 8 B.C.D. 446, 5 C.B.C.2d 1058 (Bkrtcy. D.Utah 1981), *aff'd, Ingersol-Rand Financial Corp. v. Callister*, No. 82–2249, slip op. (10th Cir. Apr. 16, 1984), but a member of the creditors' committee may not receive compensation for services rendered. *In re Liquid Transport, Inc.*, No. 82–01715, slip op. at 3 (Bkrtcy.D.Utah Oct. 7, 1983). A co-owner's interest in property may be sold where (1) partition is impractical; (2) sale of the estate's interest would realize significantly less than a sale free of the interest; and (3) the benefit to the estate outweighs the detriment to the co-owner. 11 U.S.C. § 363(h). *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 346 (1977), 1978 U.S.Code Cong. & Admin. News, p. 6302. A trustee may recover from a secured creditor the costs and expenses of preserving or disposing of collateral where the collateral declined in value during his administration. *In re Afco Enterprises, Inc.*, 35 B.R. 512 (Bkrtcy.D.Utah 1983).

In like manner, Congress intended to protect the interest of secured creditors from any impairment in value attributable to the automatic stay or to the use, sale, or lease or grant of a lien on the interest in property. *In re Alyucan Interstate Corp., supra*, 12 B.R. at 808 & n. 11a. *See* 2 COLLIER ON BANKRUPTCY ¶ 361.01, at 361–5 to 361–6 (15th ed. 1984). The rights and remedies of lessors are found in Section 365.

[T]he provisions of Section 365 trade off the rights and interests of the estate, the debtor, and the nondebtor party to the contract, in ways that can vary from the tradeoffs struck by other Code sections. Section 365 provides the trustee with powers and advantages that are not available elsewhere in the Code. For example, the right to assume the debtor's remaining obligations under a contract is probably unique to Section 365. Depending on the particular circumstances, the consequences of assumption can be beneficial to the debtor's estate and the debtor itself. The trustee's power to cure defaults on the contractual obligations of the debtor is also greater under section 365(b) than the power to cure defaults under section 108(b).

Julis, "Classifying Rights and Interests Under the Bankruptcy Code," *supra*, at 247 (footnote omitted). To require adequate protection of lessors would defeat the policy of Section 365.

If Section 361 guaranteed the benefit of the bargain as distinct from the bargain in value, it would be duplicative of Section 365. There would be no breathing spell for [the] debtor to elect whether to assume or reject a contract. This election, in effect, would be made for him by Section 361. Moreover, upon assumption of a contract, "adequate assurance" of performance, unlike adequate protection, may be accomplished by promising an administrative priority.

*In re Booth*, 19 B.R. 53, 61 n. 18, 8 B.C.D. 1393, 9 C.B.C.2d 65 (Bkrtcy.D.Utah 1982). *Accord In re Utah White Trucks, Inc.*, No. 82M–01833 (transcript of ruling) (Bkrtcy.D. Utah, Feb. 22, 1983).

A debtor in possession may assume or reject an unexpired lease at any time prior to confirmation of the plan, subject only to the court's power, on request of any party to the lease, to order the assumption or rejection within a specified period of time. 11 U.S.C. § 365(d)(2). An assumed lease becomes a nondischargeable obligation of the Chapter 11 debtor. 1 W. Norton,

BANKRUPTCY LAW AND PRACTICE § 23.05, at Part 23-Page 3 (1981).

■ In a Chapter 11 case, a trustee or debtor in possession is entitled to a reasonable time to make a careful and informed decision whether to assume or reject an executory contract or unexpired lease. *Matter of Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 378 (7th Cir.1983); *Theatre Holding Corp. v. Mauro*, 681 F.2d 102, 105 (2d Cir.1982); *Matter of Gulfco Investment Corp.*, 520 F.2d 741, 743 (10th Cir.1975) (Chapter X reorganization proceeding). *See* 2 COLLIER ON BANKRUPTCY ¶ 365.03 at 365–19 to 365.20 (15th ed. 1984); 6 COLLIER ON BANKRUPTCY ¶ 3.23[6], at 580–81 (14th ed. 1978).

■ A lessor's common law right to administrative rent is preserved under the Bankruptcy Code and provides compensation for the debtor's use of property under an unassumed lease. When an unexpired lease is rejected, the estate becomes liable for administrative rent based on the reasonable value to the estate. *Dallas-Forth Worth Regional Airport Board v. Braniff Airways, Inc.*, 26 B.R. 628, 631, 10 B.C.D. 244 (N.D.Tex.1982); *In re Peninsula Gunite, Inc.*, 24 B.R. 593, 595, 10 B.C.D. 80 (Bkrtcy.App.Pan. 9th Cir.1982). *See Matter of Fred Sanders Co.*, 22 B.R. 902, 905, 9 B.C.D. 677, 679, 7 C.B.C.2d 421 ("Until the lease is assumed, the estate is liable only for the reasonable value of the leased property—the same obligation which existed under equity receiverships and the Bankruptcy Act."); 2 COLLIER ON BANKRUPTCY ¶ 365.03[2], at 365–24 to 365–25 (15th ed. 1982).

What emerges from the foregoing analysis of the Bankruptcy Code's classification scheme of creditors' rights and the relationship between Sections 361, 363(e) and 365(b) is the inescapable conclusion that a lessor's exclusive remedies are to be found in Section 365. It is the Court's determination that a lessor is not, for purposes of Section 363(e), "an entity that has an interest in property."

CONCLUSION

Congress, in enacting the Bankruptcy Code, recognized the competing interests of creditors. The origin of the adequate protection concept shows that it was intended to protect the constitutional rights of secured creditors in their collateral under the fifth amendment's taking and due process clauses, and to enable them to receive the benefit of their bargain.

■ Congress recognized that the rights of lessors are fundamentally different from those of secured creditors. Congress has effectively dealt with the rights and remedies of lessors under Section 365 of the Code. The decision to seek an early determination of whether to assume or reject an unexpired lease rests with the lessor. If the debtor elects to assume, the lessor, unlike any other creditor, is entitled to have its entire prepetition debt cured, as well as adequate assurance of future performance under the terms of the lease. If the lease is ultimately rejected, the estate is liable for the reasonable value of the leased property during the "breathing spell" after the filing and before rejection.

The authoritative statement of Congressional intent is the joint explanatory statement of the floor managers. That statement indicates that Congress intended to provide adequate protection to secured creditors only, not lessors. This conclusion is strengthened by a review of the entire legislative history and a comparison of the provisions of Sections 361, 363(e) and 365(b): To permit lessors adequate protection would defeat the purpose of those sections.

Accordingly, the Court holds that the debtor need not provide adequate protection to First Security.